**FRANK W. SCHAEFER, INC., Appellee,**

v.

**C. GARFIELD MITCHELL AGENCY, INC. et al., Appellants.**

[Cite as *Frank W. Schaefer, Inc. v. C. Garfield Mitchell Agency, Inc.* (1992), 82 Ohio App.3d 322.]

Court of Appeals of Ohio,
Montgomery County.

No. 12744.

Decided Aug. 18, 1992.

*Robert Huffman* and *Christopher M. Gee,* for appellee.

*Arthur A. Ames,* for appellants.

---

WOLFF, Judge.

Richard Noggle, d.b.a. C. Garfield Mitchell Agency, Inc., appeals from a judgment against him and in favor of Frank W. Schaefer, Inc. in the amount of $221,700, together with interest and costs.

The facts of the case are essentially as follows.

Frank W. Schaefer, Inc. is a manufacturer of industrial furnaces. Since approximately 1962, Schaefer had purchased all of its insurance through the C. Garfield Mitchell Agency, a proprietorship owned and operated by Richard Noggle. In his capacity as insurance agent to Schaefer, Noggle was in contact with the company several times a year, in addition to conducting an annual insurance review.

In April 1985, an accident occurred at Schaefer's shop in which Dean Bourelle, an employee of Schaefer, was seriously injured while using a radial arm saw. As a result, Bourelle's hand was almost completely severed. Bourelle's hand was later reattached after extensive surgery.

On April 4, 1986, Bourelle filed a complaint against Schaefer, alleging that the removal of the saw's anti-kickback safety device constituted an intentional tort for which he was entitled to recover damages outside the workers' compensation system. Schaefer forwarded this complaint to Noggle, and Schaefer's insurance company initially provided the necessary legal representation to defend the lawsuit.

On November 12, 1986, however, the insurance company filed a declaratory judgment action to determine whether it was required, under the general liability policy purchased by Schaefer, to provide representation for the intentional tort claim, and whether it was further required to pay any resulting settlement or judgment rendered in favor of Bourelle. On September 2, 1987, the trial court determined that neither of these undertakings was covered by the general liability policy and that the insurance company was not responsible for them.

Although Schaefer then assumed responsibility for the costs of its legal representation, it continued to utilize the services of Thomas E. Jenks, the attorney originally hired by the insurance company. In evaluating Schaefer's liability, Jenks considered the facts of the case and the standards enunciated by the Ohio Supreme Court at that time. Based on this evaluation, Jenks determined that it was likely that Schaefer would lose at trial and that the

jury verdict, including punitive damages, could be in excess of $500,000. Jenks recommended that Schaefer settle the case and suggested that Schaefer obtain a second opinion. Schaefer did consult a second attorney, recommended by Jenks, who reviewed the applicable case law and the facts of the case and also determined that settlement would be prudent.

Settlement negotiations commenced and, on December 14, 1987, Schaefer settled with Bourelle for $215,000.

On July 6, 1988, Schaefer filed a complaint against Noggle, alleging that Noggle had negligently, and in breach of contract, failed to recommend that Schaefer purchase a stopgap endorsement to its general liability insurance policy, that this policy endorsement would have provided coverage for Bourelle's injury, and that Noggle's failure to recommend this endorsement resulted in Schaefer's settlement payment to Bourelle.

Trial commenced on January 14, 1991, and on January 24, 1991, the jury found in favor of Schaefer and awarded the company $221,700.

Noggle appeals, asserting four assignments of error.

"I. The trial court erroneously prevented defendants from obtaining critical and germane information, claimed to be privileged, from the files of counsel for Bourelle and Schaefer, in the underlying Bourelle case."

In this assignment of error, Noggle contends that the trial court erroneously determined that certain materials contained in the files of the attorneys who represented Schaefer and Bourelle in the underlying intentional tort claim were subject to the attorney-client privilege and exempt under the work-product provisions of Civ.R. 26. In support, Noggle argues that these materials were subject to discovery because the attorney-client privilege of both parties had been waived and because the work-product doctrine was inapplicable to this case.

The attorney-client privilege, as codified in R.C. 2317.02(A), states in pertinent part:

"The following persons shall not testify in certain respects:

"(A) An attorney, concerning a communication made to him by his client in that relation or his advice to his client, except that the attorney may testify by express consent of the client or * * * if the client voluntarily testifies * * * the attorney may be compelled to testify on the same subject."

■ Although the language of R.C. 2317.02(A) speaks only to the prohibition of testimony of privileged matters, it has nonetheless been stated that wherever a claim of privilege would be proper at the actual trial of the case, it is proper at the discovery stage. 36 Ohio Jurisprudence 3d (1982), Discovery and Depositions, Section 33. Because the same rules of privilege govern the

scope of discovery as govern admissibility at trial, a party may obtain pretrial discovery of privileged materials only if such materials fall within some exception to the privilege or if the privilege will be waived at trial. *Handgards, Inc. v. Johnson & Johnson* (N.D.Cal.1979), 413 F.Supp. 926, 929.

Civ.R. 26(B)(3), which codifies what is commonly referred to as the work-product doctrine, also limits discovery of certain information and states in pertinent part:

" * * * a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative * * * only upon a showing of good cause therefor."

■ Although the attorney-client privilege and the work-product doctrine are often employed to protect identical materials, it must be noted that these doctrines are quite different in policy and practice. The attorney-client privilege bestows upon a client a privilege to refuse to disclose and to prevent others from disclosing confidential communications made between the attorney and client in the course of seeking or rendering legal advice. See McCormick, Evidence (2 Ed.1972), Section 87; 8 Wigmore, Evidence (McNaughton Rev.1961), Section 2292. Thus, the attorney-client privilege belongs to the client, and the only materials protected are those which involve communications with his attorney. The work-product doctrine, on the other hand, belongs to the attorney and assures him that his private files shall remain free from intrusions of opposing counsel in the absence of special circumstances. *Handgards, Inc., supra,* 413 F.Supp. at 931. The work-product doctrine generally protects a broader range of materials than does the attorney-client privilege because the work-product doctrine protects all materials prepared in anticipation of trial.

■ Due to the differences between the attorney-client privilege and the work-product doctrine, most courts have held that these doctrines constitute independent and distinct sources of immunity from discovery. *Handgards, Inc., supra,* 413 F.Supp. at 929; *In re Election of November 6, 1990 for the Office of Attorney General of Ohio* (1991), 57 Ohio St.3d 614, 567 N.E.2d 243. See, also, *Hickman v. Taylor* (1947), 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. Therefore, waiver of one of these sources of immunity does not necessarily obviate the protection afforded by the other. *Handgards, Inc., supra,* at 929; *In re Election, supra,* at 615, 567 N.E.2d at 244.

Although Ohio courts do not appear to have considered the questions of whether the attorney-client privilege is waived or the work-product doctrine exemption is inapplicable in litigation wherein privileged communications

pertaining to prior litigation are at issue, these questions have been considered extensively by the federal courts. The federal courts have developed three different approaches to considering the effect of the filing of such a suit on the various privileges asserted by the plaintiff. See *Fed. Deposit Ins. Corp. v. Wise* (D.Colo.1991), 139 F.R.D. 168; *Zenith Radio Corp. v. United States* (C.A.Fed.1985), 764 F.2d 1577. The first of these approaches is the "automatic waiver" rule. As is indicated by its name, this approach mandates that any litigant who brings a claim, counterclaim, or affirmative defense which injects a privileged matter into the litigation automatically waives whatever privileges he may have had. The rationale for this approach is that the presentation of the claim or defense inherently prevents the assertion of privilege. See *Indep. Prod. Corp. v. Loew's, Inc.* (S.D.N.Y.1958), 22 F.R.D. 266; *Ghana Supply Comm. v. New England Power Co.* (D.Mass.1979), 83 F.R.D. 586.

The second approach is essentially a loose balancing test in which the need for discovery of privileged materials is balanced against the need to protect the confidentiality of the materials. See *Black Panther Party v. Smith* (C.A.D.C.1981), 661 F.2d 1243.

The third approach, as first espoused in *Hearn v. Rhay* (E.D.Wash.1975), 68 F.R.D. 574, employs a tripartite test to determine if the privilege has been waived. According to the *Hearn* approach, if (1) assertion of the privilege is the result of some affirmative act, such as filing suit, by the asserting party, and (2) through the affirmative action, the asserting party has placed *the protected information* at issue by making it relevant to the case, and (3) application of the privilege would deny the opposing party access to information vital to its defense, the court should find that the asserting party has impliedly waived the privilege through its own affirmative conduct.

### A. Attorney–Client Privilege

In determining which of these approaches is most in keeping with the purposes and policies of the attorney-client privilege, we find the examination of the Colorado District Court in *Fed. Deposit Ins. Corp., supra,* to be helpful. In adopting the third approach, *i.e.,* the *Hearn* approach, the district court stated that it did so because the first approach, *i.e.,* the automatic waiver approach, was too rigid and summarily ignored the subtle and sensitive questions inherently involved in any assertion of privilege. The district court also rejected the second approach, *i.e.,* the balancing test, because it lacked concreteness and had not been consistently applied. The court further noted that the *Hearn* approach had been adopted by several jurisdictions. See, also, *Zenith Radio Corp., supra,* 764 F.2d at 1579.

■ We agree with the Colorado District Court's analysis and consider the *Hearn* approach to be the best suited to deal with the complexities of the attorney-client privilege. In adopting this approach, we note that the Ohio Supreme Court, although never having extensively discussed this issue, has nevertheless suggested its disapproval of the automatic waiver approach. In *Waldmann v. Waldmann* (1976), 48 Ohio St.2d 176, 2 O.O.3d 373, 358 N.E.2d 521, the court held that, as to the client's subsequent address, the filing of a complaint does not constitute a waiver of the attorney-client privilege requiring the attorney to divulge that address. Given this holding and the reasonableness and widespread acceptance of the *Hearn* approach, we adopt this approach to facilitate the determination of whether the attorney-client privilege has been waived.

■ In support of his contention that discovery of the file of Schaefer's attorney in the underlying intentional tort action was permitted notwithstanding the attorney-client privilege, Noggle asserts that the attorney-client privilege between Schaefer and its attorney was waived when Schaefer filed this lawsuit and injected the issue of whether the settlement with Bourelle was reasonable. We disagree.

Applying the *Hearn* tripartite test to the facts of this case, we find that at least two of the three prongs of that test have not been satisfied and that Schaefer, therefore, did not waive its attorney-client privilege. In examining the first prong of the *Hearn* test, *i.e.*, whether the assertion of the privilege is the result of some affirmative act by the asserting party, we would find, for the reasons discussed *infra* in connection with our analysis of the second prong of this test, that Schaefer's filing of the suit against Noggle did not constitute an affirmative act which resulted in the assertion of the attorney-client privilege. However, in order to fully consider this issue, we will assume, *arguendo*, that the first prong has been satisfied on the basis that had Schaefer not filed suit, Noggle would not have chosen to defend himself by challenging the reasonableness of Schaefer's attorney's advice concerning the settlement paid, and no assertion of privilege would have been necessary.

The second prong of the *Hearn* test provides that waiver occurs only if the asserting party, through its affirmative act, has placed the protected information at issue by making it relevant to the case. Such is not the situation in this case. In filing the suit against Noggle, Schaefer called into question the issues of whether Noggle violated the standard of care required of an insurance agent when he failed to recommend that Schaefer purchase stopgap insurance and whether that failure was the proximate cause of its settlement with Bourelle. Related to the issue of proximate cause were the questions of whether the settlement was necessary and/or reasonable. Thus, it could be

said that in filing the suit, Schaefer made the determination of the propriety of the settlement a relevant issue in the case. However, this did not necessarily make the protected information relevant to the case. In defending this case, Noggle needed only to establish that the settlement was not reasonable in order to disprove Schaefer's claim that Noggle's failure to recommend stopgap insurance was the proximate cause of its settlement with Bourelle. Whether Schaefer's attorney's advice was reasonable only became an issue when Noggle chose to challenge the settlement by means of attacking the advice given by Schaefer's attorney. Thus, it was Noggle's, and not Schaefer's, actions which made the privileged information relevant to the case. The privilege belongs to the client, and it would be improper to deem it waived on the basis of the defense strategies of the client's adversary. Hence, we find that the second prong of the *Hearn* approach has not been satisfied.

The third prong, *i.e.*, whether application of the privilege would deny the opposing party access to information vital to its defense, is likewise not satisfied for basically the same reason. Noggle did not need the privileged communications of Schaefer and its counsel in his efforts to establish that the settlement was unreasonable. Rather, he could have challenged, and in fact did challenge, the settlement by means of expert testimony. An attorney expert could quite effectively examine the facts of the case and the applicable case law to determine whether Schaefer should have settled with Bourelle for the amount given, or indeed for any amount. Thus, the privileged communications of Schaefer and its attorney did not constitute information vital to Noggle's defense, and the third prong of the *Hearn* approach is not satisfied.

Accordingly, Schaefer did not waive its attorney-client privilege by filing the suit against Noggle, and any material protected by the privilege was not subject to discovery. Therefore, the trial court properly denied Noggle's request for discovery of these materials.

■ We now turn to Noggle's contention that the trial court erred in denying discovery of Bourelle's attorney's files because Bourelle had waived his attorney-client privilege. In his brief, Noggle asserts that Bourelle waived the privilege when he agreed to cooperate in Schaefer's lawsuit against Noggle. Noggle specifically relies on the following provision of the settlement agreement between Schaefer and Bourelle:

"[Bourelle], together with his Attorneys to the extent that they may ethically do so, agree to cooperate with [Schaefer] in any action that [it] may pursue in efforts to recover damages from any insurance agent or advisor for errors and/or omissions on the part of such agent or advisor with respect to the issuance of or need for insurance coverage to protect against intentional torts or similar claim of damages."

We find nothing in this statement to indicate that Bourelle waived his attorney-client privilege, either intentionally or implicitly. It is nothing more than an agreement to cooperate. Obviously, there are limits to the type of cooperation that Bourelle could have been compelled to give, even if that cooperation would have helped Schaefer's case. Absent some clear expression of Bourelle's intent to waive his attorney-client privilege, we believe such waiver would have been beyond Bourelle's duty to cooperate. Our conclusion is further reinforced by the fact that Bourelle's attorney was careful to clearly communicate that he would cooperate only within the limits of his ethical obligations (presumably referring, at least in part, to the fact that he would not testify as to privileged matters, and thereby indicating his belief that his client had not waived his attorney-client privilege). Hence, the trial court properly denied discovery of materials which were privileged under Bourelle's attorney-client privilege.

### B. Work–Product Privilege

We next turn to the question of whether the work-product doctrine affords protection to attorney files prepared during preparation of prior litigation, and, if so, whether the trial court properly determined that the work-product doctrine afforded protection to the attorney files at issue in this case. The work product at issue in this case is not the type of work product typically protected by the work-product doctrine. Specifically, the files which the trial court deemed not discoverable in this case were not prepared in anticipation of this case, but rather were prepared in anticipation of the prior suit which Bourelle filed against Schaefer.

Civ.R. 26(B)(3) provides that a party may obtain discovery of materials "prepared in anticipation of litigation or for trial" only upon a showing of good cause therefor. Although the work-product doctrine is typically applied to protect material prepared in anticipation of ongoing litigation, nowhere does the rule so limit its protection.

While Ohio courts have not considered whether Civ.R. 26(B)(3) may be applied to protect work product prepared in anticipation of prior litigation, several federal courts have addressed the issue within the context of Fed. R.Civ.P. 26(b)(3). See *Republic Gear Co. v. Borg–Warner Corp.* (C.A.2, 1967), 381 F.2d 551; *Coleco Indus., Inc. v. Universal City Studios* (S.D.N.Y. 1986), 110 F.R.D. 688; *Duplan Corp. v. Moulinage et Retorderie de Chavanoz* (C.A.4, 1974), 509 F.2d 730; *Hercules, Inc. v. Exxon Corp.* (D.Del.1977), 434 F.Supp. 136. Although these courts differ as to the applicability of the work-product doctrine to cases involving prior litigation, they approach the problem in similar fashion. For instance, these courts consider whether the policy of the work-product doctrine, *i.e.*, the maintenance of an adversarial

system, would be best served by permitting or withholding the protections of the work-product doctrine.

In making this determination, several courts consider (1) whether the work product prepared in anticipation of the past litigation is closely related to the present litigation, (2) whether permitting discovery of work product in subsequent cases would result in a chilling effect on the performance of attorneys preparing for litigation, or (3) whether the work product in past litigation consists of material which is directly at issue in the present litigation. See *Hercules, supra,* 434 F.Supp. at 152; *Duplan Corp., supra,* 509 F.2d at 736; *Handgards, Inc., supra,* 413 F.Supp. at 932, respectively. It should be noted that this final element basically constitutes waiver of the work-product doctrine. Once it is determined that the work product sought to be discovered is directly at issue, it is deemed discoverable regardless of the other considerations of related cases and chilling effect. It is within the context of examining whether work product is directly at issue in any particular case that the *Hearn* approach becomes necessary. See *Handgards, Inc., supra,* at 932–933; *Fed. Deposit Ins. Corp., supra.*

■ Whether work product prepared during prior litigation is protected by the work-product doctrine must be determined on a case-by-case basis. The policy of the work-product doctrine would not be served by a rigid rule either permitting or forbidding protection of work product in such circumstances.

■ Applying the three considerations utilized by the federal courts in resolving this issue, we examine whether the trial court in this case correctly determined that the files of Schaefer's and Bourelle's attorneys, pertaining to the prior litigation between them, were protected from discovery by the work-product doctrine.

First, it is clear that the underlying intentional tort claim between Schaefer and Bourelle and this case between Schaefer and Noggle were very closely related. Given the fact that the insurance company denied responsibility for, and was determined not to be responsible for, this claim, it was probable that Schaefer and its attorneys would contemplate a future lawsuit against either the insurance company or Noggle to recover any monies it was required to pay as a result of this noncoverage. Indeed, the fact that Schaefer contemplated a suit against Noggle is evident from the language in the settlement agreement, discussed *supra,* which states that Bourelle and his attorney would cooperate in any subsequent suit against Schaefer's insurance carrier or agent.

Second, as discussed in conjunction with our analysis of the attorney-client privilege, the work product of Schaefer's and Bourelle's attorneys was not

directly at issue in this case, and therefore neither attorney should have been considered to have waived the protection of the work-product doctrine.

Third, as a general proposition, we think that the prospect of an attorney's work product being discoverable in subsequent litigation might well have a chilling effect on that attorney's performance.

Accordingly, we find that the trial court did not err in determining that the work product of Schaefer's and Bourelle's attorneys pertaining to the prior litigation was protected from discovery by the work-product doctrine.

The first assignment of error is overruled.

"II. The trial court erred in refusing to direct a verdict in favor of defendants after the close of the plaintiff's case."

In this assignment of error, Noggle contends that the trial court erred in refusing to direct a verdict in his favor at the close of Schaefer's case. In his brief, Noggle argues that a directed verdict should have been granted because Schaefer failed to establish that Noggle was negligent or that that negligence was the proximate cause of Schaefer's settlement with Bourelle.

In support of his contention that Schaefer failed to establish any negligence on his part, Noggle argues that Schaefer's experts were not credible and that stopgap insurance coverage was so uncommon in the industry at the time in question that it would not have been outside an insurance agent's standard of care not to recommend it to his client.

The question of the credibility of Schaefer's expert witnesses is not a proper topic for consideration on a motion for directed verdict, and therefore the trial court did not err in failing to grant a directed verdict on this basis. See *TLT–Babcock, Inc. v. Serv. Bolt & Nut Co.* (1984), 16 Ohio App.3d 142, 16 OBR 149, 474 N.E.2d 1223.

However, the issue of the proper standard of care to be applied to insurance agents was of primary importance to the trial court's determination of the directed verdict motion. If Noggle's failure to recommend stopgap insurance was a reasonable act and not in violation of his duty to Schaefer, Schaefer's claim, even if proximately caused by Noggle's actions, would be without basis.

After reviewing the evidence in this case, in the light most favorable to Schaefer as required by Civ.R. 50(A)(4), we conclude that the evidence could have supported a finding that the standard of care within the insurance industry required Noggle to recommend stopgap insurance to his client. Schaefer presented the testimony of two insurance experts who stated that there was considerable information in circulation within the industry pertaining to the availability and coverage of stopgap insurance. Both of these experts admitted that stopgap insurance was not sold by every insurance

company in Ohio, but stated that it was sold by several companies and could have been procured by any agent through a brokering process. These experts further testified that, in their opinions, Noggle had been negligent in both failing to inform Schaefer of the availability of stopgap insurance and in failing to recommend such coverage for Schaefer. Indeed, Noggle's own expert, despite his testimony that stopgap insurance was of dubious value, acknowledged that he recommended that insurance agents make their clients aware of the availability of stopgap insurance.

Given these facts, we conclude that the trial court did not err in denying Noggle's motion for directed verdict on the basis that Schaefer had failed to establish that Noggle had been negligent.

We next consider Noggle's contention that the trial court should have granted a directed verdict on the basis that Schaefer failed to establish that any negligence on Noggle's part was the proximate cause of Schaefer's settlement with Bourelle. In support of this contention, Noggle argues that there was no evidence that stopgap insurance, even had he recommended it and Schaefer decided to purchase it, would have been available for Schaefer's business, or that it would have covered Bourelle's injury. Noggle further asserts that his negligence was not the proximate cause of Schaefer's settlement payment to Bourelle because Schaefer had no legal duty to settle with Bourelle, and any payment made was a volunteer payment for which the company cannot be reimbursed. We disagree.

Our review of the record indicates that there was evidence that stopgap insurance would have been available to Schaefer. Both of Schaefer's experts testified that, of the six stopgap forms introduced into evidence, only the form which was restricted to hospital clients would have been inapplicable to Schaefer. Furthermore, Schaefer entered into evidence an insurance quote from an outside insurance agent which had included a stopgap policy among the types of insurance it would procure for Schaefer. Therefore, there was evidence that Schaefer could have obtained stopgap insurance had Noggle recommended that the company do so.

Moreover, our review of the record also indicates that there was evidence that had Schaefer obtained stopgap insurance, it would have covered Bourelle's claim. Although there was much discussion at trial of the semantics of insurance language as well as the public policy concerns of permitting insurance for intentional harmful acts, Schaefer's experts testified that stopgap insurance would provide coverage for such claims. These experts further testified that stopgap insurance policies provided coverage for the attorney fees, costs, and final judgment associated with intentional tort claims. Therefore, we find no merit to Noggle's contention that the trial court was required

to find that, even had Schaefer purchased stopgap insurance, it would not have provided coverage for Bourelle's intentional tort claim.

Finally, we consider whether the trial court erroneously denied Noggle's motion for directed verdict on the basis that it was Schaefer's voluntary decision to settle with Bourelle, and not any negligence on Noggle's part, which was the proximate case of Schaefer's loss. In this somewhat complex argument, Noggle asserts that Bourelle would not have prevailed at trial because the standard of care for establishing an intentional tort claim became progressively more stringent as more cases were considered by the Ohio courts. Noggle further contends that, in evaluating the strength of Schaefer's defense, its attorney should have anticipated this favorable change and refused to settle the case. Therefore, the argument continues, any decision not to await a trial on this claim was unreasonable and any payment to Bourelle was a volunteer payment, without any legal obligation therefor. Thus, Noggle contends that the settlement to Bourelle resulted from Schaefer's voluntary decision, and not from any negligence on Noggle's part.

The cases upon which Noggle relies for this argument are *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, and our opinion in *Seth v. Capitol Paper* (Aug. 29, 1990), Montgomery App. No. CA 11539, unreported, 1990 WL 125724. In *Van Fossen*, the Ohio Supreme Court examined the history of the workers' compensation system, the development of the intentional tort claim against employers, and the proof necessary to establish such a claim. In so doing, the court noted that many courts had misconstrued its holding in *Jones v. VIP Dev. Co.* (1984), 15 Ohio St.3d 90, 15 OBR 246, 472 N.E.2d 1046, and thereby "transform[ed] negligence cases into intentional tort cases." In order to reduce the confusion associated with the holding in *Jones* detailing the "intent" required for an intentional tort claim, the court clarified the definition as follows:

"We now interpret *Jones* to require knowledge on the part of the employer as a vital element of the requisite intent. * * * [W]e hold that in order for 'intent' to be found for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality, or condition within his business operation; (2) knowledge by the employer that if employees are required by virtue of their employment to be subjected to such dangerous process, * * * then harm to them would be a substantial certainty, and not just a high risk; (3) that the employer, under such circumstances, and with such knowledge, did act to so require the employee to continue performing his employment tasks.

"We recognize that pursuant to this interpretation of 'intent' as set forth above, proof of actual or subjective intent of the actor to accomplish the consequences is not required. Our discussion herein is directed toward significantly limiting the areas within which 'intent' on the part of the actor may be circumstantially *inferred.*" (Emphasis *sic.*) *Van Fossen,* 36 Ohio St.3d at 116–117, 522 N.E.2d at 504.

In *Seth,* this court examined *Van Fossen* within the context of facts similar to the situation in Bourelle's claim.

Noggle's reliance on these cases as essential to the defense preparations of Schaefer's attorney is misplaced for several reasons. First, both of these cases were decided years after Bourelle filed his complaint against Schaefer and at least five months after the settlement agreement was finalized. Therefore, these cases were not available to Schaefer's attorney at the time he was evaluating Schaefer's defense of Bourelle's claims. Moreover, Noggle does not argue that there was any reasonable basis upon which Schaefer's attorney should have been aware of, much less expected, this change in the law. He merely asserts that the "intent" requirement for an intentional tort claim became more difficult to establish, and that Schaefer's attorney should have refused to settle so that Bourelle would have been forced to prove intent at trial.

Second, even if Schaefer's attorney could have anticipated that the Supreme Court would reconsider the intent requirement of the intentional tort cause of action, it would be unreasonable to require him to base his evaluation of Schaefer's defense on the stricter definition of "intent" in *Van Fossen,* unless he should also have been reasonably expected to anticipate that this change would be retroactively applied. Indeed, the court in *Van Fossen* determined that the stricter definition should be applied retroactively, but this does not mean that attorneys would have been negligent had they not anticipated such application.

Third, although the facts in *Seth* do bear a striking resemblance to the facts in the underlying *Bourelle* case, we see no reason why Schaefer's attorney should have anticipated our opinion in *Seth.*

Moreover, even if Schaefer's attorney could have anticipated that the law might, at some future point, change in the employer's favor, he was nevertheless entitled to rely on the cases available to him at the time he was considering settlement. We see nothing in either the facts of this case or in Noggle's arguments which would cause us to conclude that Schaefer's attorney was required to ignore the dictates of current case law and the possibility of an advantageous settlement purely on the chance that the law might change or that a case with a similar fact pattern might be decided in a manner

favorable to Schaefer, and be deemed to have retroactive application, all in time to affect Bourelle's case.

Accordingly, we conclude that Schaefer's attorney's failure to anticipate the decisions of *Van Fossen* and *Seth* neither rendered the settlement with Bourelle an unreasonable and voluntary payment, nor negated Schaefer's proximate cause evidence.

The second assignment of error is overruled.

"III. The trial court erroneously prevented defendant's expert attorney from testifying about the facts and law of comparative cases, to wit: *Seth vs. Capitol Paper*, and *Van Fossen vs. Babcock & Wilcox Co.;* and prevented said expert from testifying as to his opinion regarding said comparisons."

In this assignment of error, Noggle contends that the trial court's refusal to permit his expert to testify concerning the *Seth* and *Van Fossen* decisions and their relation to Bourelle's case against Schaefer was prejudicial to his defense.

For the reasons stated in connection with our disposition of the second assignment of error, we conclude that these two cases are not relevant to the determination of whether Schaefer's settlement with Bourelle was reasonable, for the reasonableness of the settlement should have been, and was, tested by the standards enunciated by the case law in existence at the time the settlement was reached. Therefore, the trial court correctly prevented Noggle's expert from either testifying about the specifics of those cases or from comparing those cases to Bourelle's claim.

Furthermore, even were we to determine that the trial court's limitation of the testimony of Noggle's expert was prejudicial to Noggle's defense, we would nonetheless find that any error resulting from this ruling was harmless. Our examination of the record indicates that while the expert was not able to testify concerning *Seth* or *Van Fossen*, he was able to express his opinion that Bourelle would not have prevailed at trial even under the less stringent standard enunciated in *Jones*, and that Schaefer should not have paid Bourelle's claim. Therefore, Noggle was able to elicit from the expert the testimony which he needed to refute the reasonableness of Schaefer's settlement, and thereby dispute that his negligence was the proximate cause of Schaefer's payment to Bourelle.

Accordingly, the third assignment of error is overruled.

"IV. The trial court erred in refusing to instruct the jury on the applicable law from *Van Fossen vs. Babcock and Wilcox Co.*, and in refusing to submit interrogatories based on *Seth vs. Capitol Paper*, to the jury in the form proposed by the defense."

In this assignment of error, Noggle argues that the trial court erred in refusing to instruct the jury on the law as enunciated in *Van Fossen,* and in refusing to submit interrogatories based on *Seth.* We disagree.

In its jury instruction, the trial court utilized the case law which was available to Schaefer's attorneys at the time of the settlement. Per our disposition of the second assignment of error, we conclude that the trial court acted properly in instructing the jury on the requirements of those cases, rather than basing its instruction on the requirements established by *Van Fossen* after the settlement was finalized.

Civ.R. 49(B) governs the use of interrogatories in connection with a general verdict and provides in pertinent part:

"The court shall submit written interrogatories to the jury * * * upon request of any party prior to the commencement of argument. * * * The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, *but the interrogatories shall be submitted to the jury in the form that the court approves."* (Emphasis added.)

This rule has been described by the Ohio Supreme Court as being mandatory in character in that it leaves no discretion to the trial court on the question of submitting interrogatories to the jury once they are requested by either party. However, the Supreme Court has also stated that the rule maintains the trial court's discretion as to the content of the interrogatories to be submitted. See *Cincinnati Riverfront Coliseum v. McNulty* (1986), 28 Ohio St.3d 333, 28 OBR 400, 504 N.E.2d 415.

In refusing to submit the interrogatories requested by Noggle, the trial court explicitly acknowledged that, having been requested to do so, it was required to submit interrogatories to the jury. However, the trial court stated that it was unwilling to submit the interrogatories in the form provided by Noggle because the form set forth a "whole series of gradations of legal conclusions as opposed to operative facts." The trial court then stated that it redrafted the interrogatories in a manner which dealt with the ultimate facts that had to be determined.

Based on our review of the interrogatories, we conclude that the interrogatories drafted by the trial court were sufficient to cover the issues covered in Noggle's proposed interrogatories, namely, whether Schaefer's conduct in relation to Bourelle's injury was sufficient to establish a valid intentional tort claim for which Schaefer would be held liable. Therefore, the trial court did not abuse its discretion in altering the form of Noggle's requested interrogatories.

Accordingly, the fourth assignment of error is overruled.

The judgment of the Montgomery County Court of Common Pleas will be affirmed.

*Judgment affirmed.*

FAIN, P.J., and WILSON, J., concur.