[Cite as *Cherryhill Mgt., Inc. v. Branham*, 2020-Ohio-596.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| CHERRYHILL MANAGEMENT, INC. | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28438 |
| v. | : | Trial Court Case No. 2017-CV-925 |
| BETH ANNE BRANHAM, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellees | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 21st day of February, 2020.

. . . . . . . . . . .

SCOTT R. THOMAS, Atty. Reg. No. 0061040, 250 Grandview Drive, Suite 500, Fort Mitchell, Kentucky 41017
    Attorney for Plaintiff-Appellant

BETH ANNE BRANHAM, 2801 Campus Drive, Dayton, Ohio 45406
    Defendant-Appellee, Pro Se

DAVID C. AHLSTROM, Atty. Reg. No. 0085784, 280 North High Street, Suite 1010, Columbus, Ohio 43215
    Attorney for Defendants-Appellees, Molly Kefaya and Tareq Kefaya

WILLIAM H. FALIN, Atty. Reg. No. 0038839, 1422 Euclid Avenue, Suite 630, Cleveland, Ohio 44115
    Attorney for Appellee, Nationwide Mutual Insurance Company

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Cherryhill Management, Inc. ("Cherryhill") appeals from the trial court's December 17, 2018 judgment sustaining Tareq Kefaya's motion for summary judgment on Cherryhill's complaint against him for negligent entrustment and respondeat superior liability. Cherryhill also appeals from a February 12, 2019 judgment of the trial court sustaining Mollie Kefaya's motion for summary judgment on Cherryhill's complaint against her for negligent entrustment. In addition to challenging these judgments, Cherryhill challenges the trial court's refusal to allow Cherryhill to obtain discovery from the Kefayas' insurer, Nationwide Mutual Insurance Company (Nationwide). We hereby affirm the judgment of the trial court.

{¶ 2} Cherryhill filed its complaint against Beth Anne Branham and Tareq and Mollie Kefaya on February 21, 2017. Count 1 asserted a claim against Branham for negligence, Count 2 asserted a claim against the Kefayas for negligent entrustment, and Count 3 asserted a claim against the Kefayas for respondeat superior liability. The complaint alleged that on November 15, 2016, Branham, who did not have a valid driver's license, drove a 2012 Honda Accord owned by Tareq and/or Mollie Kefaya into a stationary truck leased and operated by Cherryhill in Clayton, Ohio.[1]

{¶ 3} On March 17, 2017, Cherryhill filed a notice of its intent to take the depositions of one or more officers of the Kefayas' insurer, Nationwide and filed a

---

[1] According to a pretrial statement filed by the Kefayas and Tareq Kefaya's motion for summary judgment, the Keyafas divorced in 2016, and in the divorce decree, Mollie Kefaya was awarded the Honda Accord that was being driven by Branham at the time of the accident. The Kefayas assert that Tareq had no control over the vehicle at the time of the accident, did not live with Mollie at that time, and had no relationship with Branham. For purposes of this case, the Kefayas have filed some motions and other documents jointly, and we refer to them as such. However, where appropriate, we refer to them separately by their first names.

subpoena duces tecum pursuant to Civ.R. 30(B)(5) and Civ.R. 45. The subpoena asked Nationwide to produce policy number 9234N339835 and all documents and communications relating to it and asked Nationwide to produce documents and communications related to claim number 164 890 GE or between Nationwide and any person regarding Mollie Kefaya or Branham.

{¶ 4} On March 22, 2017, the court issued a notice that Branham had not been served. On April 6, 2017, the Kefayas filed an answer and a cross-claim against Branham for indemnity and/or contribution.

{¶ 5} On April 19, 2017, Nationwide filed a motion to quash Cherryhill's subpoena duces tecum. Nationwide asserted that, while the existence and contents of the Kafayas' insurance policy was discoverable, and that policy had been produced, other information sought in Cherryhill's subpoena, such as documents relating to the insurance policy and Nationwide's investigation into the Kefayas' potential liability for and Nationwide's potential duty to cover the loss for which Cherryhill sought recovery were not discoverable and, in fact, were protected from discovery by attorney-client privilege and/or the work product doctrine. Nationwide asserted that it had denied coverage under the policy for Branham's alleged conduct.

{¶ 6} Nationwide also asserted that the subpoena should be quashed for lack of relevance. Nationwide argued that its internal investigation and communications among its insureds, agents, and adjustors, had "no bearing whatsoever on the merits of the negligence and agency claims" alleged by Cherryhill. Nationwide further asserted that the subpoena should be quashed based on applicable privileges, pursuant to Civ.R. 45(C). Nationwide asserted that the documents sought in Cherryhill's subpoena were

so clearly protected from discovery by attorney-client privilege and the work product doctrine that Nationwide should not be put to the undue burden and expense of preparing a privilege log describing the nature of these documents. Finally, Nationwide argued that, if the court concluded that there were any legitimate questions as to the discoverability of the documents at issue, it should be allowed to provide a log and have the court conduct an evidentiary hearing or in camera review of the protected documents before ordering that any of them be produced.

{¶ 7} On May 3, 2017, Cherryhill opposed the motion to quash. Cherryhill asserted that Branham spent time at Mollie's home performing dog-watching services and as such, was a "regular invitee." Cherryhill argued that it was in dispute whether Branham had Mollie's express or implied permission to drive the car on the day in question. Pointing out that the accident was "a two-car collision without injuries, without any dispute about causation" and that Nationwide issued "an expedited decision * * * that no coverage existed," Cherryhill asserted that "Nationwide's claim of burden rings hollow." Cherryhill argued that, if Nationwide had followed Civ.R.45(C)(4), it would have prepared a privilege log regarding the documents allegedly protected by privilege; "instead, Nationwide ask[ed] the Court to rule blindly without any evidence from Nationwide regarding the documents it ha[d] held back."

{¶ 8} Cherryhill further asserted that, if Nationwide created a privilege log, Nationwide and Cherryhill could discuss the merits of Nationwide's objections to production. Cherryhill asserted as follows:

> * * * Then Cherryhill can decide whether to explore issues further
> with the Court, e.g., whether good cause exists for the production of witness

statements that cannot be obtained by other means, whether an insurer can claim a work product privilege for documents created after its decision that the policy didn't provide coverage, and whether the documents identified in the privilege log reflect alternate explanations for why Nationwide deemed the car to be driven without authority when no one ever reported a stolen vehicle to law enforcement authorities. Indeed, if Nationwide agrees to produce any proof of a determination by law enforcement officials that the Honda was stolen – or even proof merely that the police conducted some inquiry about *whether* the car was stolen – Cherryhill will withdraw its request for additional information and make this motion to quash moot.

Likewise, the log will disclose whether Nationwide's arguments are even relevant. For example, Nationwide cites precedent for the notion that an insurer's sending a report to its attorney for preparation of a defense make the document protected from disclosure. * * * Because Nationwide hasn't created a log, however, neither Cherryhill nor the Court knows whether such a document exists. Cherryhill and the Court are likewise in the dark about whether there are "statements taken by an insurer from witnesses," or "communications between the insurer and its insured," or indeed whether there is even a "coverage investigation," which Cherryhill very much doubts.

Nationwide has not given Cherryhill or this Court the information needed to rule on a motion for protective order. Having failed to carry its burden, Nationwide's motion must be denied. The Court should decline

Nationwide's invitation to do the work the rule requires. [Sic.] * * *

(Emphasis sic.)

{¶ 9} On May 11, 2017, Nationwide filed a reply in support of its motion to quash. Nationwide pointed out that Cherryhill could not bring a "bad faith" claim against Nationwide under Ohio law because Cherryhill was not insured by Nationwide, as required by Ohio's "direct action" rule. Nationwide also pointed out that Cherryhill's brief in opposition did not even attempt to address the irrelevance of the information Cherryhill sought or the privileged and protected nature of that information. Nationwide argued that there was "no authority to permit a plaintiff in a negligence action to discover the defendant's liability insurer's claim file before judgment * * *."

{¶ 10} Nationwide described Cherryhill's Civ.R. 45(C)(4) argument as "misplaced, at best." Nationwide asserted that under Civ.R. 45(C)(4), the parties are required to make an effort to resolve disputes related to a subpoena only when the dispute is based on whether the subpoena creates an undue burden. However, Nationwide did not file its motion pursuant to Civ.R. 45(C)(3)(d), claiming undue burden; it filed its motion pursuant to Civ.R. 45(C)(3)(b), referring to the disclosure of privileged or otherwise protected matter. "[T]here was no rule requiring non-party Nationwide to make pre-motion [to quash] efforts to try to convince [Cherryhill] that it [was] not entitled to the records it [sought] because they [were] privileged and protected."

{¶ 11} Finally, Nationwide argued that, as a non-party to the action, Civ.R. 45 did not require it to submit or provide a privilege log; "the privileges and protections Nationwide has asserted are so clear that going to the burden and expense of preparing a privilege log that would cover all of the requested records should not be required."

Nationwide also noted that it offered to provide a privilege log.

{¶ 12} On July 19, 2017, Cherryhill filed a motion for default judgment against Branham for failure to answer or appear.

{¶ 13} On November 6, 2017, Cherryhill filed subpoena to depose Cargelia Stanley, an adjuster employed by Nationwide.  On November 22, 2017, Stanley moved to quash the subpoena.

{¶ 14} On November 30, 2017, the trial court referred the case to a magistrate for a damages hearing.  On December 14, 2017, the court granted Cherryhill's motion to enter a default judgment against Branham in the amount of $4,858.99, plus interest and costs.

{¶ 15} On December 5, 2017, Cherryhill opposed Stanley's motion to quash.  On January 10, 2018, Stanley filed a reply.

{¶ 16} On January 25, 2018, the Kefayas filed a pretrial statement, and on January 29, 2018, Cherryhill and the Kefayas filed a joint pretrial statement.

{¶ 17} On March 27, 2018, Cherryhill's attorney, Justin Whittaker, filed an affidavit. It stated that service on Branham via certified mail had been unsuccessful, and that the complaint and summons had been delivered via ordinary mail at Branham's last known address on March 27, 2017.  Whittaker averred that 1) Branham had not answered or requested an extension of time to do so, 2) Cherryhill's damages were $4,858.99, and 3) Cherryhill had incurred court costs of $331.50, deposition transcript fees of $1,684, and witness appearance fees of $38.80.

{¶ 18} On July 10, 2018, the court sustained the motions to quash of Nationwide and Stanley.  The court determined in part as follows:

It is initially noted that Nationwide has provided to [Cherryhill] a certified copy of the auto insurance policy issued to Defendants as required under Ohio Civ.R. 26(B)(2). [Cherryhill] seeks further disclosure of documents relating to Nationwide's investigation of the accident that is the subject of [Cherryhill's] lawsuit.

Nationwide is not a party to this action, and there is no bad faith claim being asserted. As a result, the Court finds that the information sought by [Cherryhill] in both subpoenas is not relevant to the instant lawsuit and is therefore not discoverable and the subpoenas are quashed on that basis.

Further, Ohio Civ.R. 45(C) protects persons from the disclosure of privileged or otherwise protected matter. Generally, Ohio courts do not "impose a duty upon insurers to actively assist plaintiff in civil actions" against their insureds. In *Kraus v. Maurer*, 740 [N.E.2d] 7222 (8th Dist. 2004), the Court opined:

> To impose such an obligation would give rise to numerous ethical issues. For instance, if a plaintiff ultimately obtains a judgment against an insured in an amount greater than the insured's policy limits for which the insured is personally responsible and the insurer was instrumental in permitting service to be perfected on the insured, has the insured breached a fiduciary duty owed to the insured? What would be the obligation of the insured if the plaintiff decided that in addition to the address of the insured, he also needed

additional information from the claims file, such as driving or medical histories[?] In Ohio, courts have traditionally permitted discovery of an insurer's claims files only in instances where bad faith is alleged or where a prevailing party seeks prejudgment interest. This court declines to expand upon this rule, especially in situations such as in the present case where the ends sought to be accomplished by the appellee are readily obtainable through other, more traditional, means. It is abundantly clear that the claim file being sought is protected by both the "attorney-client privilege" and the "work product doctrine." The file is not being sought in concert with a bad faith claim and, therefore, is not discoverable.

In the case at bar, both the subpoena duces tecum issued to Nationwide and the subpoena duces tecum and for appearance at a deposition issued to its claims adjuster, Cargelia Stanley, seek information that is privileged and work product.

{¶ 19} On September 20, 2018, Cherryhill filed a motion for default judgment against Tareq based upon his failure to appear for deposition due to extended travel to Israel. The next day, the court issued an order granting default judgment as a sanction upon Tareq. On October 1, 2018, the court issued an order vacating the default judgment against Tareq, noting that the motion for default judgment would be considered following the briefing permitted by the court.

{¶ 20} On September 21, 2018, Tareq filed a motion for summary judgment. Tareq set forth the following statement of facts:

> \* \* \*
>
> Just prior to [the] collision [at issue], Defendant Branham was in the home of Defendant Mollie Kefaya, entered Defendant Kefaya's private bedroom without permission, located Ms. Kefaya's spare car key within a dresser drawer, again without permission, and took her vehicle without Ms. Kefaya's permission. \* \* \* Defendant Branham was then involved in the subject matter automobile accident with Plaintiff's employee, Logan Hofferbert.  Defendant Branham confirmed to Officer Daniel Hamlin that she was using the Kefaya vehicle without permission of Mollie Kefaya. \* \* \* Plaintiff alleges that Defendant Tareq Kefaya negligently entrusted his vehicle to Defendant Branham.
>
> Defendant Tareq Kefaya and Mollie Kefaya's marriage was officially dissolved by this very Court effective July 11, 2016. \* \* \* Defendant Tareq Kefaya was not the legal owner of the vehicle at the time of the impermissive use. \* \* \* Defendant Tareq Kefaya was not present or involved in any way with the relationship with Ms. Branham. \* \* \*

Tareq further asserted that Cherryhill could not demonstrate negligent entrustment or any employer/employee relationship between Tareq and Branham.  Attached to his motion was a copy of a Clayton Police Department accident report, copies of Mollie's and Officer Hamlin's depositions, and a copy of Tareq and Mollie's final decree of dissolution of marriage.

{¶ 21} On October 5, 2018, Cherryhill filed memorandum in opposition to Tareq's motion for summary judgment; in the alternative, Cherryhill also sought summary judgment pursuant to Civ.R. 56(F). Cherryhill argued that summary judgment was improper because Tareq had "intentionally and willfully failed to attend his deposition and fulfill his discovery obligations." Cherryhill cited the Kefayas' cross-claim against Branham, which asserted that the Kefayas "had nothing to do with that accident or those injuries apart from being the owners of the vehicle" that Branham took without permission; according to Cherryhill, the use of the plural "owners" referred to Tareq and Mollie and constituted a "judicial admission," which Tareq could not later refute. Cherryhill argued that Tareq's motion was "similarly lacking" on the issue of permission, because he relied on a police report which was not admissible because Officer Hamlin did not observe the event and was not an accident reconstruction expert. Finally, Cherryhill argued that Mollie was unreliable, noting that she asserted that she owned the Accord, citing the divorce decree, but the decree states that the Accord was " 'titled in Husband's name alone' and remains so titled until the loan on the vehicle is paid off." Cherryhill asked for additional time for discovery, asserting that the court should not rule on Tareq's motion for summary judgment until he was deposed, which Cherryhill had neem trying to do for many months.

{¶ 22} On October 12, 2018, the Keyafas opposed Cherryhill's motion for default judgment against Tareq. They requested 30 days to "attempt to produce [Tareq] for a video deposition from Palestine" before the Court took "the extreme sanction of default," given that Tareq had initially appeared and answered and had otherwise been represented in all aspects of the case. On October 16, 2018, Cherryhill filed a reply.

{¶ 23} The trial court granted Tareq's motion for summary judgment. It stated:

In the case at bar, Tareq Kefaya was on the title of the automobile that was involved in the accident at the time of the accident. The divorce settlement between Mr. and Mrs. Kefaya, however, makes it clear that Mollie Kefaya is the owner of the vehicle. This evidence is persuasive despite [Cherryhill's] argument that Tareq's Kefaya's pleadings state that he is an owner of the car involved in the accident. Further, even though Mr. Kefaya was on the title at the time of the accident, [Cherryhill] has not produced any evidence that Mr. Kefaya knew Branham or that she had any access to the vehicle. Thus, there is no evidence sufficient under Ohio Civ.R. 56(F) to refute the deposition testimony of Mollie Kefaya * * * that Tareq Kefaya has never met Branham and was not living in the house with Mollie Kefaya at the time of the accident. * * * There is no evidence before the Court that Tareq Kefaya knew (i) Branham, (ii) that she may be an incompetent driver, or (iii) that she had access to the vehicle. Accordingly, [Cherryhill] has failed to state a prima facie case for negligent entrustment against Tareq Kefaya because it cannot be shown that Branham operated the vehicle with Tareq Kefaya's knowledge and permission. Thus, Tareq Kefaya is entitled to summary judgment on [Cherryhill's] negligent entrustment claim.

Likewise, [Cherryhill's] claims fail under a theory of respondeat superior. This claim is derivative of Branham's liability. To prevail, however, [Cherryhill] must show that an employer/employee type of

relationship existed between Tareq Kefaya and Branham. No such showing has been made. To the contrary, the only evidence related to the relationship between Tareq Kefaya and Branham is that the two had never met, and that Tareq Kefaya was divorced from Mollie Kefaya and not living in the homes that Mollie had allowed Branham to visit. [Cherryhill] has not presented evidence to refute this deposition testimony of Mollie Kefaya. Accordingly, Tareq Kefaya is entitled to summary judgment on [Cherryhill's] derivative claim under the theory of respondeat superior.

Based on the foregoing, no genuine issue of material fact exists for trial on [Cherryhill's] claims against Tareq Kefaya, and Tareq Kefaya is entitled to summary judgment in his favor and against [Cherryhill].

Finding no liability on the part of Mr. Kefaya, this Court concludes that granting default judgment in favor of [Cherryhill] for his [Tareq's] failure to attend a deposition is not an appropriate remedy. Accordingly, [Cherryhill's] motion for default judgment against Tareq Kefaya is not well-taken.[2]

{¶ 24} On January 11, 2019, Mollie Kefaya filed a motion for summary judgment. She noted that the trial court had specifically asked the parties to address whether hearsay statements made by Branham about her prior use of another vehicle were admissible as evidence. Mollie asserted that Branham's hearsay statements to Officer Hamlin about her prior use of another vehicle were not admissible. First, she argued that

---

[2] We note that the trial court implicitly overruled Cherryhill's alternative Civ.R. 56(F) motion for summary judgment, rather than doing so expressly by separate judgment entry.

the statements were not prior statements of a witness under Evid.R. 801(D)(1), because Branham would not be present as a witness in the proceeding. Second, Mollie asserted that the statements were not admissions by a party-opponent under Evid.R. 801(D)(2), because they were not offered against the party making the statements; Cherryhill hoped to offer Branham's statements against Mollie. Mollie also argued that none of the hearsay exclusions under Evid.R. 803 were applicable to Branham's statements regarding her prior use of a vehicle when she provided daycare to Mollie's children. Mollie argued Evid.R. 804, which applies when a declarant is unavailable, was inapplicable because Cherryhill had not proven that Branham was unavailable, and it bore the burden to do so. According to Mollie, the only "definition that even arguably applies" to Branham is subsection 5. Mollie argued that it was Cherryhill's burden to "prove that this definition applies." Finally, Mollie asserted that none of the Evid.R. 804(B) hearsay exceptions applied. Specifically, she argued that Branham's statements were not statements against interest, because it would actually "be *in* her interest to try to show a history of driving Kefaya vehicles," whereas Branham's statements to Officer Hamlin about driving *without* permission would be against her interest because they could subject her to legal or criminal sanctions.

{¶ 25} Mollie argued that, without Branham's hearsay statements, Cherryhill's negligent entrustment claim failed; Mollie maintained that Branham did not have permission to drive the vehicle, and Cherryhill could not otherwise show that Branham had permission to drive the vehicle. Regarding implied permission, Mollie asserted that since Branham would not be present to testify or offer evidence that she subjectively believed that she had implied permission, there was no evidence upon which to conclude

that Branham had implied permission. Cherryhill also could not demonstrate that Branham was incompetent to drive, even if permission to do so were implied. Finally, Mollie asserted that Cherryhill could not demonstrate any employer/employee relationship between her and Branham. Attached to the motion were copies of the Clayton Police Department accident report and of Mollie's and Officer Hamlin's depositions.

{¶ 26} Cherryhill opposed Mollie's motion for summary judgment. Cherryhill noted in a footnote that it elected not to pursue its theory of respondeat superior liability against Mollie and so advised her in the joint pretrial statement. According to Cherryhill, Mollie's testimony that she did not expressly give Branham permission to use the car was "fatally undermined by her ulterior motivation * * * to keep [Tareq] at a distance from this dispute" due to her fear of his reaction. According to Cherryhill, Mollie's motivation constituted "a fundamental bias" that undermined her credibility and created "an issue of credibility to be resolved by the jury."

{¶ 27} Citing the parties' decree of disillusion, Cherryhill asserted that Mollie's testimony that Tareq paid to insure the vehicle under the court order was "undermined by Cherryhill's compelling impeachment evidence."

{¶ 28} Cherryhill asserted that it had "compelling circumstantial evidence" that Branham had Mollie's implied permission to drive the vehicle. Cherryhill also argued that it had circumstantial evidence of Mollie's actual knowledge that Branham was an incompetent driver. Cherryhill asserted that Branham's statements to Officer Hamlin were admissible, but that that ruling was not dispositive, because other evidence in the case supported the same inference –that Branham had used the car on prior occasions with

Mollie's permission. According to Cherryhill, the fact that Cherryhill obtained a default judgment against Branham did not change the fact that Branham was a party to the case. Mollie's suggestion that the statements were inadmissible because Branham could not be found, despite due diligence, was flawed and would create the "absurd result" that, "had Ms. Branham not absconded, the evidence would have probative value against her but not against [Mollie]." Cherryhill asserted that a "statement that satisfies the rule as against one party opponent is admissible as against all party opponents."

{¶ 29} Finally, Cherryhill asserted:

> [Mollie] wants this Court to rule that she can elicit hearsay from the unavailable Ms. Branham but Cherryhill cannot. [Mollie] argues: Defendant Branham also confirmed to Officer Hamlin that she was using the Kefaya vehicle without permission of Mollie Kefaya. * * * That is admissible as hearsay as a statement against her interest. [Evid.R.] 804(B)(3). This undisputed evidence should nullify [Cherryhill's] claim entirely." * * * If the court accepts [Mollie's] reasoning, then the earlier statement of Ms. Branham to [Officer] Hamlin is admissible as a prior *inconsistent* statement.

(Emphasis sic.)

{¶ 30} On February 1, 2019, Mollie filed a reply in support of her motion for summary judgment asserting that Cherryhill was "not entitled" to a trial on its claim because it had failed to produce "evidence of actual permission," and Evid.R. 801(D) and 613(B), by their express terms, "require that the statement be of a party/witness at trial and be subject to cross or offered against that party."

{¶ 31} Mollie argued that Evid.R. 804(A) required Cherryhill to provide evidence of a witness's unavailability. Mollie also argued that Cherryhill had not developed during discovery any admissible evidence that Branham was an incompetent driver, such that Mollie could be liable for negligent entrustment, or that Mollie knew of such incompetence. Mollie argued that even if Cherryhill "can establish potential incompetence through the use of the alleged pleas, [Cherryhill] has not and cannot show that [Mollie] knew about it." Mollie pointed out that she testified in her deposition she (Mollie) did not even learn that Branham did not have a driver's license until the time of the accident; it had never come up because Branham had never asked to use Mollie's vehicle in the recent years of their relationship (since 2016). Mollie argued that driving "had only been an issue during 1998 to 2001," years during which Branham had "actively" cared for Mollie's then-minor children "and sometimes needed a car to do so."

{¶ 32} Mollie argued that her "kind motive" in refusing to press charges against Branham should not "magically undermine her defense." Mollie pointed out that Branham "confirmed to Officer Hamlin that 'she had driven a vehicle' belonging to" Mollie in the past, but she did not say what type of vehicle or when or where that occurred.

{¶ 33} On February 8, 2019, the court issued an amended default judgment entry against Branham.

{¶ 34} In its entry granting summary judgment in favor of Mollie, the court did not address the admissibility of Officer Hamlin's testimony, although it cited that testimony. The court noted that Hamlin testified that Branham admitted that she became impatient, was in a hurry, and tried to go around the truck that she struck. The court noted that Hamlin was not an accident reconstruction officer and that he concluded that Branham

was at fault "based upon a consensus of the information" that he received from Branham and the driver of the truck. The court referenced that Hamlin noted that Branham did not own the Honda Accord she was driving, and he had the impression that she did not have permission to drive the vehicle, but had driven the owner's vehicles in the past.

{¶ 35} The court determined in part as follows:

> In her motion, [Mollie] Kefaya states: For purposes of this motion only, Defendants are not disputing that the accident at issue was caused by Defendant Branham. * * * Since Branham is in default to answer, the Court will accept that concession as satisfying the requirement of showing that the driver of the owner's vehicle was negligent. The Court accepts this concession as including that some damage was caused to plaintiff's truck by the negligence of Branham.
>
> * * *
>
> [Mollie] came to the scene of the accident. [Mollie] testified that Branham told her the truck backed into her while she was following other traffic in going around the stopped truck. Officer Hamlin did not cite the driver of the truck. After talking to Officer Hamlin, defendants [Mollie] and Branham drove away together in the damaged vehicle. They remained friends. [Mollie] offers no testimony that she was upset with Branham for driving the Honda Accord the short distance to the McDonald's and quickly returning to the house.

{¶ 36} The court noted Mollie's deposition testimony that she did not give Branham express permission to drive her Accord on the day of the accident. It found that it was

undisputed that Branham was living with Mollie and taking care of "her's [sic] and Mollie's" children[3] and that Branham had driven cars owned by Mollie in the past. The court noted that "[p]ermissive use of the vehicle must be actual but may be found by the jury as implied permission even though the owner denies expressly granting permission."

{¶ 37} Regarding "implied entrustment" of the vehicle, the court found:

On November 15, 2016, Branham and her two children spent the night at [Mollie's] house. [Mollie] was planning to work the next morning and then they would tear out her bathroom for remodeling. [Mollie] rode with a friend to work and took her set of keys. However, she had always kept a spare car key in her dresser. Branham retrieved the key to take her children on a short drive to McDonald's. On the way back from McDonald's the 2012 Accord driven by Branham collided with plaintiff's truck, about 2 and ½ blocks from [Mollie's] house.

[Cherryhill] has been unable to depose Branham. Thus, the testimony of [Mollie] is all the evidence of the relationship between her and Branham prior to the accident on November 15, 2016. * * * [Mollie] testified that she had co-signed with Branham for the purchase of a Ford Ranger truck during the time that Branham lived with her sometime between 1998 and 2001. During approximately 2001, Branham had a boyfriend and got pregnant; [Mollie] helped her get a job with the State of Ohio and helped her

---

[3] At some points, the court seems to say that Branham was taking care of both women's children; in other places, the court references only Branham's children. Other filings suggest that the Kefaya children had been cared for by Branham in the past but were grown by the time of the accident. *See* ¶ 80-81, below.

get the Ford Ranger. But Branham was not responsible about the job or the payments due on the truck. [Mollie] went and took possession of the truck and took over the payments. Their friendship ended. There is no evidence that Branham had been negligent in operating the Ford Ranger.

The friendship revitalized in 2016 about nine months prior to the accident. [Mollie] invited Branham back into her home to take care of [Mollie's] children. In the earlier period back in 1998 to 2001, Branham, would cook for the children and run errands and would use [Mollie's] vehicle. [Cherryhill] argues that the relationship between [Mollie] and Branham was such that Branham had implied permission to use [Mollie's] Honda for short errands without [Mollie] expressly granting permission at the time. [Mollie] testified, "I clearly did not give her permission to take the car." [Mollie] did not accuse Branham of stealing the Honda. [Mollie] admitted that she kept the spare key in her dresser as she had done back in 1998-2001. She acknowledged that there were McDonald's bags in the Honda when she arrived at the scene of the accident, only a short distance from her home. She stated that she didn't care where Branham was going on the day of the accident. * * * Such a response could be construed to mean it was not a concern because it was incidental to her care of the children that such a short drive would be permitted. On the other hand, it could be construed to mean she does not remember because it was not important. Of course, she did not learn that Branham did not have a valid operator's license until she found out at the accident scene, presumably from the police officer.

[Cherryhill] argues that in the months prior to the accident Branham was living in [Mollie's] house from time to time, implying the same implicit permission to use her vehicle for incidental matters as in the time she lived with her in 1998-2001. However, [Mollie] testified: "Beth never lived in my house from time to time in the last 17 years, never has lived in my home in the last 15 years. She has stayed at my house on, for several occasions, her or her children, but never in any type of capacity where she had any right to view my home as her home." She further explained that the car was not "really technically stolen . . . I still considered her a friend, I still felt for her, I still felt bad for her." * * *

Construing the evidence in favor of [Cherryhill], Branham knew that [Mollie] kept a spare car key in her dresser. Branham retrieved it for a very short trip to McDonald's. [Mollie] knew or should have known that Branham knew about the spare key and did not expressly prohibit Branham from driving the vehicle on such a short trip for lunch.

The Court has construed the evidence in favor of the nonmoving party, [Cherryhill], and finds that a reasonable jury could conclude that the relationship between [Mollie] and Branham was such that Branham impliedly had authority to operate the Honda Accord for a short trip to McDonald's on the date of the accident. For purposes of the motion, the Court finds the use of the Honda Accord on November 15, 2016 was permitted by the owner [Mollie].

(Citations omitted.)

{¶ 38} Regarding Mollie's knowledge of Branham's "incompetency" as a driver, the court concluded as follows:

Officer Hamlin cited Branham for driving with a suspended operator's license. As indicated, [Mollie] has not provided appropriate Civ.R. 56 evidence that Branham pled guilty to that charge. Nevertheless, the only evidence about [Mollie's] knowledge that Branham did not have a valid operator's license was [Mollie's] own statement. She stated: "I can't say to be honest what I would or wouldn't have done as far as allowing her to take it because that had never been an issue with us before. But I had never – it's not like we had ever discussed it, but I found out at that time [time of the accident] she didn't even have a valid driver's license." There is no evidence to the contrary. There is no other evidence indicating that Branham was an incompetent driver or a reckless or inexperienced driver, much less that [Mollie] knew or should have known of that characteristic.

Accordingly, the Court finds that there is no genuine issue of material fact that [Mollie] lacked the requisite knowledge that Branham was an incompetent or reckless or inexperienced driver before implicitly allowing her to drive the Honda Accord.

(Citations omitted; brackets sic.)

{¶ 39} Based on these findings, the trial court entered summary judgment in favor of Mollie.

{¶ 40} We note that Cherryhill initially filed a notice of appeal on February 28, 2019. On April 17, 2019, this Court issued a show cause order in which we noted that

Cherryhill's respondeat superior claim against Mollie Kefaya, as well as the Kefayas' cross-claim(s) against Branham for indemnity and/or contribution appeared to be unresolved. We noted that the cross-claim(s) might be moot if all of Cherryhill's other claims had been resolved. On May 24, 2019, we concluded that our show cause order had not been satisfied and that there was no final appealable order; we returned the matter to the trial court to enter a final appealable order. *See Cherryhill Mgt., Inc. v. Branham*, Montgomery App. No. 28317. On June 7, 2019, Cherryhill filed a motion to dismiss its respondeat superior claim. On June 11, 2019, the trial court granted the motion to dismiss and issued a notice of final appealable order to the parties.

{¶ 41} Cherryhill raises three assignments or error on appeal. Its first assignment of error is as follows:

THE TRIAL COURT ERRED UNDER RULE 45 IN REFUSING TO PERMIT CHERRYHILL TO OBTAIN DISCOVERY IN THE FORM OF DOCUMENT REQUESTS AND DEPOSITION TESTIMONY MERELY BECAUSE THE THIRD PARTY WAS AN INSURANCE COMPANY AND ITS EMPLOYEE RESPECTIVELY.

{¶ 42} Cherryhill asserts that Nationwide denied coverage on the basis of its conclusion that Branham had borrowed Mollie's Kefaya's car *without* permission, and whether Branham had permission was also at the core of Cherryhill's case for negligent entrustment. Thus, Cherryhill asserts that the communications between Nationwide's adjuster, Ms. Stanley, and Mollie were "important, relevant, and unobtainable by any other means regardless of the cost," and Cherryhill should have been permitted to discover that information.

**{¶ 43}** As this Court has noted:

"Ordinarily, a discovery dispute is reviewed under an abuse-of-discretion standard." (Citation omitted.) *Ward v. Summa Health Sys.*, 126 Ohio St.3d 212, 2010-Ohio-6275, 943 N.E.2d 514, ¶ 13. But "if the discovery issue involves an alleged privilege, * * * it is a question of law that must be reviewed de novo. (Citation omitted.) *Ward* at ¶ 13.

*Harvey v. Cincinnati Ins. Co.*, 2d Dist. Montgomery No. 27470, 2017-Ohio-9226, ¶ 7.

**{¶ 44}** Here the trial court determined that the discovery sought was not relevant and not discoverable, which involved questions of fact, and also that it was privileged and protected pursuant to Civ.R. 45(C), which was a question of law.

**{¶ 45}** Civ.R. 26(B)(1) provides: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *." Civ.R. 26(B)(2) provides: "A party may obtain discovery of the existence and contents of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part of all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment. * * *."

**{¶ 46}** Civ.R. 45(C)(3) states: "On timely motion, the court from which the subpoena was issued shall quash or modify the subpoena, or order appearance or production only under specified conditions, if the subpoena does any of the following: * * * (b) Requires disclosure of privileged or otherwise protected matter and no exception or waiver applies."

**{¶ 47}** The trial court determined that the discovery sought was "privileged and

work product." As noted by the Seventh District:

> The work-product doctrine emanates from the United States Supreme Court decision in *Hickman v. Taylor* (1947), 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. *Hickman* was concerned that the attorney-client privilege was not broad enough to protect the memoranda, briefs, notes, and other writings prepared by counsel for his or her own use during the course of pursuing a case. *Id.* at 508 * * *. The court reasoned that if such materials did not receive some protection during the discovery phase of litigation, much of what is normally put down in writing, such as interviews, statements, legal theories, opinions, and mental impressions, would never be written down, ultimately causing the interests of the client to suffer. *Id.* at 511 * * *. The *Hickman* work-product doctrine now protects all materials prepared in anticipation of litigation, and gives almost absolute protection to the opinions, conclusions, judgments, and legal theories of a client's attorney. *Id.* at 511 * * *; *State v. Hoop* (1999), 134 Ohio App.3d 627, 642, 731 N.E.2d 1177, 1187-1188; *Frank v. Schaefer, Inc. v. C. Garfield Mitchell Agency, Inc.* (1992), 82 Ohio App.3d 322, 329, 612 N.E.2d 442, 446-447.

> Civ.R. 26(B)(3) codifies Ohio's version of the work-product doctrine as it pertains to civil cases:

> > "Trial preparation: materials. Subject to the provisions of subdivision (B)(4) of this rule, *a party may obtain discovery of documents and tangible things prepared in anticipation of litigation*[4]

---

[4] The rule now references subdivision (B)(5) and specifically includes discovery of

or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor. A statement concerning the action or its subject matter previously given by the party seeking the statement may be obtained without showing good cause. A statement of a party is (a) a written statement signed or otherwise adopted or approved by the party, or (b) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement which was made by the party and contemporaneously recorded." (Emphasis added)

* * *

* * * The issue in *Breech [v. Turner*, 127 Ohio App.3d 243, 712 N.E.2d 776 (4th Dist.1998)]* was whether a third party could obtain discovery of statements made by an insured to his insurance adjuster regarding an automobile accident. *Id.* at 247 * * *. The third party had sued the insured for negligence in allowing his cows to wander on a nearby road, which led to the accident. The documents in question allegedly contained evidence that the insured told the adjuster that he had seen cows on the road.

The *Breech* court held that the trial court was within its discretion to deny the plaintiff's motion to compel discovery of statements made by an insured which were recorded by the insured's liability insurer and that were

---

electronically stored information, as well as documents and tangible things.

then passed on to the lawyer representing the insured pursuant to the insurance contract. *Id.* at 250 * * *[;] see, also, *In re Klemann* (1936), 132 Ohio St. 187, 7 O.O. 273, 5 N.E.2d 492, paragraph one of syllabus. The rationale for prohibiting discovery of such statements is that the insurance company is required to take such statements from its insureds to prepare a defense and is normally required to provide defense counsel to the insured as part of its coverage. Any statements made by the insured in this context are in essence communications intended for defense counsel and therefore fall under the protective umbrella of the attorney-client privilege. *Breech*, 127 Ohio App.3d at 250 * * *; *Klemann* at 194 * * *.

*Dennis v. State Farm Ins. Co.*, 143 Ohio App.3d 196, 200-202, 757 N.E.2d 849 (7th Dist.2001).

{¶ 48} In *Kerner v. Terminix Internatl. Co., LLC*, S.D. Ohio No. 2:40-CV-0753, 2008 WL 321267 (Jan. 31, 2008), the Southern District of Ohio noted:

The *Breech* court held that the defendant's statement was protected by the attorney client-privilege. The court appeared to conclude that the attorney-client relationship which existed between the insured and the attorney hired by his insurance company to represent him included, as intermediaries, the insurer and the adjuster which it hired to assist in defending the claim. Thus, the court characterized the insured's statement as "[a] brief note purportedly summarizing the defendant's statement [made] to the . . . adjuster [which] was then provided to Grange [the insurer], which in turn provided the statement to defendant's counsel in order to prepare a

defense. . . ." *Breech*, 127 Ohio St.3d at 250. In other words, the court held that since any communication made directly from the insured to his counsel would be privileged, the privilege was not vitiated by the fact that there were two additional participants in the line of communication, both of whom were acting as agents of the attorney for purposes of obtaining the statement from the attorney's client.

*Breech* relied, in turn, on the Ohio Supreme Court's decision in *In re Klemann,* 132 Ohio St. 187 (1936). That case also upheld a claim of an attorney-client privilege for a report transmitted to an attorney retained to defend the insured. The court held that the privileged character of the document turned upon whether it was "brought into being primarily as a communication to the attorney," *id*. at 191, as opposed to a document that had been prepared for some other purpose and subsequently transmitted to an attorney. The latter type of document cannot acquire privileged status simply because it is later transmitted to an attorney, because that was not the original purpose for which it was created.

Read broadly, these cases can be cited (and have been cited) for the proposition that the entire contents of an insurer's claims file are protected by the attorney-client privilege. *See, e.g. Kraus v. Maurer*, 138 Ohio App.3d 163, 167 (Cuyahoga Cty.2000). That, however, is clearly not the law. In *Peyko v. Frederick*, 25 Ohio St.3d 164 (1986), the case in which the Ohio Supreme Court held that an insured who makes a bad faith claim against an insurer may be entitled to access to certain portions of the claims

file, that court established a procedure by which the trial court in such a case is to examine the claims filed on an *in camera* basis to determine "which portions of the file, if any," are protected by the attorney-client privilege and to permit the insured to review the balance of the file. *Id.* at 167. Certainly, if the entire filed is subject to attorney-client privilege, there would be no need for such a procedure. Consequently, the pertinent question is not whether the statement has become part of the claims file but whether, in the words of the *Klemann* court, it was created for the primary purpose of being transmitted to an attorney retained to defend the insured.

That interpretation of *Klemann* is reflected in later decisions. For example, in *Hunter v. Wal-Mart Stores*, 2002 WL 1058191 (Clinton Cty.App. May 28, 2002), the court noted that employee witness statements concerning a slip-and-fall incident which were procured by the defendant, while not protected by the work product privilege (because * * * there was no evidence that litigation was reasonably foreseeable when the statements were made), were covered by the attorney-client privilege because "the witness statements were later given by Wal-Mart to its legal counsel for the purpose of defending against [the plaintiff's] lawsuit." *Id.* at *5. Cases like *Hunter* appear to accept the proposition that the purpose for which such statements are made may be inferred from the surrounding circumstances, so that the later transmittal of the statement to an attorney is not the key fact, but simply a confirmation that the statement was, when made, intended to be a privileged communication. Thus, another Ohio appellate court has

noted that "[a]ny statements made by the insured in this context [i.e. to a claims adjuster hired by the insurer after a potential claim has arisen] are in essence intended for defense counsel and therefor fall under the protective umbrella of the attorney-client privilege." *Dennis v. State Farm Ins. Co.*, 143 Ohio App.3d 196, 202 (Mahoning Cty. App.2001). *See also Metroflight, Inc. v. Argonaut Ins. Co.*, 403 F.Supp. 1195 (N.D. Tex. 1975) (noting that limited privilege under Texas law for communications between insurer and insured is an outgrowth of the attorney-client privilege and is premised upon the understanding that such communications will be shared with counsel for purposes of defending the legal interests of the insured).

*Kerner* at *2-3.

**{¶ 49}** Cherryhill sought "any and all documents and communications relating to Claim No. 164 890 GE," and all communications between Nationwide and any person regarding Mollie and Branham. We conclude that the trial court abused its discretion in determining that such documents and communications were not relevant, but that it correctly determined that the information sought required "disclosure of privileged or otherwise protected matter and no exception or waiver applies." Civ.R. 45(C)(3)(b). This is consistent with the rationale for prohibiting discovery of such information, namely that the insurance company is required to obtain such information from its insured to prepare a defense and provide it to defense counsel. The trial court correctly concluded that the information Cherryhill sought fell under the protective umbrella of the attorney-client privilege as well as the work product doctrine, as the trial court determined. Cherryhill had the opportunity to depose Mollie, and the fact that Branham failed to appear

for a scheduled deposition did not entitle Cherryhill to the documents and communications it sought.

{¶ 50} Cherryhill's first assignment of error is overruled.

{¶ 51} We will consider Cherryhill's second and third assignments of error together. They are as follows:

THE TRIAL COURT ERRED IN GRANTING DEFENDANT TAREQ KEFAYA'S MOTION FOR SUMMARY JUDGMENT UNDER CIV.R. 56.

THE TRIAL COURT ERRED IN GRANTING DEFENDANT MOLLIE KEFAYA'S MOTION FOR SUMMARY JUDGMENT UNDER CIV.R. 56.

{¶ 52} In its second assignment of error, Cherryhill asserts that Tareq is "estopped" from claiming a lack of ownership of the vehicle, again citing the language of the Kefayas' cross-claim. Cherryhill asserts that the trial court allowed Tareq to argue that Cherryhill was unable to present evidence against him, when "it was his own flouting of discovery rules that caused the inability." Cherryhill asserts that Mollie's "motivation" to keep Tareq "at a distance from this dispute" demonstrated "fundamental bias" and undermined her credibility. Cherryhill argues that it was entitled to have the evidence of bias "weighed by the jury." Finally, Cherryhill asserts that the trial court erred by denying Cherryhill the opportunity "to take advantage of [Tareq's] offer of a deposition conducted remotely."

{¶ 53} In its third assignment of error, Cherryhill asserts that the trial court "erred by weighing the evidence, ignoring Cherryhill's circumstantial evidence, and deciding the issue itself." According to Cherryhill, after 2001 when Mollie "repossessed the truck she purchased with Ms. Branham, [Mollie] knew that Ms. Branham didn't own, and hadn't

owned, a car for some fifteen years. * * * Ms. Branham always relied on [Mollie] or others for transportation." Cherryhill further asserts:

In addition, [Mollie] had personal knowledge that Ms. Branham was not the kind of person that was going to maintain a driver's license. Ms. Branham is single and then had five children. The father of her children provided no support to her, perhaps because of his ten *other* children. The house Ms. Branham had been living in "burned down and she lost everything," forcing her to move to a homeless shelter. Ms. Branham was unemployed, struggling to survive on government assistance.

A person who knew those facts should have known that Ms. Branham was not going to have a driver's license in her purse. A woman who has no beds for her children to sleep in is unconcerned with keeping things up to date at the Bureau of Motor Vehicles. This constitutes "knowledge implied from known facts and circumstances." Indeed [Mollie] almost connected the dots herself when she testified: "And knowing Ms. Branham did not have a car, I assume she did not have car insurance, . . ." Cherryhill was entitled to have the jury make the same kind of reasonable inference: that a person in Ms. Branham's position would be unlikely to possess a driver's license.

The same evidence supports the inference that [Mollie] should have known that Ms. Branham was an inexperienced driver. There is no evidence she had done any driving in 15 years. The jury was entitled to consider that inference as well.

(Citations omitted.)

{¶ 54} According to Cherryhill, Mollie had an interest in the outcome of the case that affected her credibility. Cherryhill asserts that Mollie testified that Tareq paid the insurance on the vehicle, but when she produced the divorce decree, it "said the opposite of what [Mollie] said in her deposition." Cherryhill argues that this "contradiction" supported its position that Mollie's testimony was unreliable and unworthy of belief, and whether impeachment evidence renders a witness's testimony unreliable is a question for the trier of fact. Finally, Cherryhill asserts that the trial court erred in granting summary judgment to Mollie without allowing Cherryhill to obtain discovery from Nationwide.

{¶ 55} The Kefayas respond that, under the plain language of the separation agreement, Tareq was not an owner of the Honda Accord, and Cherryhill could not refute this fact, regardless of any additional time or discovery under Civ.R. 56(F). The Kefayas assert that Cherryhill seeks "to bootstrap surmise for actual evidence" to attempt to show Mollie's knowledge of Branham's alleged incompetence as a driver where no evidence exists.

{¶ 56} The Kefayas further assert that the dissolution decree clearly provides that the lienholder "would not amend the title until the loan was paid off (an issue typical in dissolutions)," but that the court could confirm as a matter of law that Tareq did not own the vehicle at the time of the accident. Thus, Cherryhill's claim against Tareq for negligent entrustment was "fatal" and summary judgment in his favor was appropriate. The Kefayas also argue that this court, the Second District Court of Appeals, "has never recognized the liability of a non-owner exercising control for negligent entrustment," and other districts have specifically rejected this idea.

{¶ 57} The Kefayas assert that there was no legal dispute that Mollie Kefaya was an owner of the vehicle, but that was not the issue for purpose of the negligent entrustment claim; they argue that the fact that Branham did not have a vehicle for 15 years did not compel the conclusion that she was unlicensed. They argue that Cherryhill's reliance on *Keely v. Hough,* 11th Dist. Trumbull No. 2004-T-38, 2005-Ohio-3771*,* is misplaced because actual driving behaviors that were known to the owners were at issue in that case; it did not focus predominantly on the lack of a driver's license.

{¶ 58} In reply, Cherryhill argues that Tareq's argument -- that "the lender had recourse against him as the owner of the Honda but Cherryhill did not" – was without merit. Regarding Mollie, Cherryhill asserts that the "very fact that circumstantial evidence can be interpreted in different ways illustrates why the issue cannot be resolved on summary judgment."

{¶ 59} This Court has previously noted:

Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115, 526 N.E.2d 798 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a

court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996).

Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293, 662 N.E.2d 264; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* The non-moving party has the burden "to produce evidence on any issue for which that party bears the burden of production at trial" and may not rest upon unsworn or unsupported allegations in the pleadings. *Parker v. Bank One, N.A.*, 2d Dist. Montgomery No. 18573, 2001 WL 303284, *3, citing *Leibreich v. A.J. Refrigeration, Inc.,* 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993), *Wing v. Anchor Media, Ltd.*, 59 Ohio St.3d 108, 111, 570 N.E.2d 1095 (1991), and others. Throughout, the evidence must be construed in favor of the nonmoving party. *Dresher* at 293, 662 N.E.2d 264.

*Heard v. Dayton View Commons Homes*, 2018-Ohio-606, 106 N.E.3d 327, ¶ 7-8 (2d Dist.).

{¶ 60} As this Court has further noted:

* * * "To sustain an action for negligent entrustment of a vehicle, the plaintiff must show that the vehicle was driven with the owner's permission and authority, that the person entrusted with the vehicle was an incompetent driver, and that the owner knew or should have known that the driver was

incompetent when the vehicle was entrusted to him." *St. Amand v. Spurling*, 2d Dist. Montgomery Nos. 20904, 20929, 21391, 20931, 2006-Ohio-4391, ¶ 9, citing *Gulla v. Straus*, 154 Ohio St. 193, 198, 93 N.E.2d 662 (1950). "It is quite generally held that the liability in such cases arises from the combined negligence of the owner and the driver; of the former in entrusting the machine to an incompetent driver, and of the driver in its operation." *Williamson v. Eclipse Motor Lines*, 145 Ohio St. 467, 471, 62 N.E.2d 339 (1945). *Accord Smith v. The Buckeye Union Ins. Co.*, 2d Dist. Shelby No. 79-CA-9, 1980 WL 352686, *3 (Apr. 21, 1980), citing *Williamson*.

*Hicks v. State Farm Mut. Auto. Ins. Co.*, 2017-Ohio-7095, 95 N.E.3d 852, ¶ 21 (2d Dist.).

**{¶ 61}** Regarding Cherryhill's second assignment of error, we conclude that the trial court properly granted summary judgment in favor of Tareq. While Tareq's name appeared on the vehicle's title, the parties' separation agreement, which was incorporated into their 2016 final decree of dissolution of marriage, stated:

The Wife shall retain, free and clear from any claim of the Husband, a 2012 Honda Accord, which is encumbered by a loan through PNC Bank with a remaining balance of approximately $7,000.00. The loan is titled solely in Husband's name and [the] vehicle [is] titled Husband's name alone. Husband agrees to be solely responsible for said loan. Once loan is paid in full, Husband shall sign any paperwork necessary to remove his name from said vehicle within thirty days of the final loan payment. After loan is paid in full, Wife agrees to hold Husband harmless and blameless thereon

for any maintenance, future loans, insurance and/or any other future liability
of said vehicle.

Parties agree to independently insure themselves and respective
motor vehicles.

{¶ 62} Pursuant to the separation agreement, Tareq had no claim to the 2012
Honda at the time of the accident. Further, in the course of Mollie's deposition, she
explained that, since the divorce, she and Tareq communicated only through a phone
app, WhatsApp. Tareq had contacted her through the app when he learned about the
lawsuit:

So he contacted me through [WhatApp]. And the next thing I know
he's sending me pictures of the lawsuit with him named on, what is this?
So I explained to him what it was. He said, does this involve me? I'm like,
no. Honestly, I don't feel it does at all. He doesn't know the woman, he's
never met the woman, he wasn't living in the house at the time. Outside of
his legal obligation that was ordered through the courts, he wouldn't even,
you know, be a part of the vehicle except for that was the divorce decree
agreement. So I really at that moment and still feel that he has nothing to
do with this.

{¶ 63} Mollie's testimony was consistent with the provision of the separation
agreement that Tareq's only connection to the 2012 Honda was his court-ordered
obligation to pay off the loan in his name.

{¶ 64} As noted by the First District, the court in *Gulla v. Straus*, 154 Ohio St. 193,
93 N.E.2d 662, "did not hold that *only* the owner of an automobile could be sued for

negligent entrustment." *Rice v. Kanoza*, 1st Dist. Hamilton No. C-110595, 2012-Ohio-2581, ¶ 7. As the court in *Rice* further noted:

> Other districts are split on the issue of whether liability for negligent entrustment should be predicated on ownership of the vehicle involved. Relying on the Restatement of Torts, the Eighth Appellate District determined in dicta that a nonowner could be sued for the negligent entrustment of an automobile if the automobile had been under the nonowner's control. *See Motorists Ins. Co. v. Sokol,* 8th Dist. No. 45380, 1983 Ohio App. LEXIS 12943 (Apr. 7, 1983), relying on Restatement of the Law 2d, Torts, Section 308 and 390 (1965).
>
> By contrast, the Sixth and Ninth Appellate Districts have interpreted *Gulla* as limiting liability for negligent entrustment to the owner of the entrusted vehicle. *See Dunne v. Hanson,* 6th Dist. No. L-01-1414, 2002-Ohio-2267; *Gray v. Giacomelli*, 9th Dist. No. 94CA005949, 1995 Ohio App. LEXIS 2502 (June 7, 1995); *DiFilippo v. Hamrlik*, 9th Dist. No. 93CA005698, 1994 Ohio App. LEXIS 6118 (Dec. 30, 1994). * * *

*Rice* at ¶ 8-9.

{¶ 65} We need not address whether Tareq, as the individual whose name appeared on the title, could be liable on the negligent entrustment claim, because the 2012 Honda Accord was not under his control. In other words, Tareq had no access to the vehicle or any ability to entrust it to Beth. The parties' marriage was dissolved four months before the accident, and Mollie testified that Tareq did not reside in Mollie's home at the time of the accident or have any access to the vehicle and Tareq had never met

Branham.

{¶ 66} Cherryhill's suggestion that Tareq was disingenuous in acknowledging that PNC Bank had recourse against him, but Cherryhill did not, lacks merit. That Tareq was required by court order to pay off the loan on the car did not alter his status as an ex-husband with no control over the vehicle. Construing the evidence most strongly in favor of Cherryhill, we see no genuine issue of fact for trial. Tareq was entitled to summary judgment on Cherryhill's negligent entrustment claim as a matter of law. Cherryhill's second assignment of error is overruled.

{¶ 67} Regarding Cherryhill's third assignment of error related to summary judgment in favor of Mollie, we note the following evidence about Mollie's relationship with Branham. Mollie testified that she met Branham around 1998; when Mollie's regular babysitter was no longer available, the babysitter recommended Branham to replace her. At the time, Mollie was single; Branham began watching her children while she worked and did so for a "couple of years." Mollie stated that Branham was "probably a 17-year-old girl when she started watching the kids." Mollie testified that Branham would occasionally run errands in Mollie's car, "but it wasn't like it was all the time" because when Mollie was at work, the car was not accessible to Branham. According to Mollie, Branham was not allowed to take her car "at will"; she had to have a reason or to ask permission, "she just couldn't take it." Mollie testified that it was understood, "it's my car, you can only use it if you have permission."

{¶ 68} Mollie testified that Branham lived with her from 1999-2001 because Branham did not have a place to stay. Mollie helped Branham "get a vehicle," a Ford Ranger on which Mollie co-signed, but Branham "wasn't being responsible with it," so

Mollie took it back. At that point, Mollie's son was turning 16, so she gave him the car and cut off all communications with Branham. Mollie testified that she also helped Branham get the job with the State, but Branham did not show up for work. Mollie also stated that in 2001, Branham got a boyfriend, got pregnant, moved out, and their friendship ended.

{¶ 69} Mollie testified that she and Branham renewed their friendship in 2016, eight or nine months prior to the accident. At that time, Branham was not employed and had five kids; her house had burned down and she was in a homeless shelter at some point, then she obtained "temporary housing in a really super bad neighborhood and she was waiting to get moved into a nicer home." Mollie testified that the father of Branham's children did not provide support. Mollie testified that she felt badly for Branham and her kids, who did not have air conditioning or beds in their home, so she let Branham amd her kids spend the night at her (Mollie's) home; sometimes the kids spent the night even if Branham did not. Mollie also helped Branham run errands to the doctor, grocery, or pharmacy.

{¶ 70} Mollie testified that Branham occasionally spent the night more than one night in a row, but not often; sometimes the kids stayed two or three nights, but Branham wasn't there that whole time. Branham stayed at the home once when Mollie was out of town to watch her dog, but Mollie testified that Branham "did not have the authority" to use Mollie's vehicle at that time. Branham would sometimes be dropped off at Mollie's home by a friend name Lilly, or Mollie or Mollie's son would pick her up; Branham did not have a vehicle. When asked how Branham would get into Mollie's home if Mollie was not present, Mollie responded, "if she was already there and I had things to do, I would

just leave and she'd just be there. Usually, that was the arrangement. * * * But my [youngest] son was there, too, so he could let her in and out if she came for another reason."

{¶ 71} Mollie testified that, on the day of the accident, she was "fairly certain" that Branham had spent the night before with her two youngest girls. Mollie stated that Branham "also lived with her mom, so her mom helped take care of some of the kids for her." Mollie testified that she had started to remodel her bathroom, and Branham was helping her with that project. On the day of the accident, Mollie's co-worker, Brittany, drove her to work, she worked a half day, and she planned to come home after having lunch with Brittany to work on the bathroom with Branham. Mollie received a call from Branham before lunch advising her of the accident.

{¶ 72} Brittany drove Mollie to the scene of the accident, which was a couple of blocks from Mollie's home. Mollie testified that she did not "make issue" out of Branham's use of the vehicle at the time, because she did not think that she would be held responsible for it in any way, knowing that she had not given her permission to take the car. She testified that there were McDonald's bags in the car, and Branham "had clearly been to McDonalds," but that "it really didn't matter" to her where Branham had gone. The following exchange occurred:

[Plaintiff's Counsel] Q. * * * And I imagine, without knowing, that if, if Beth had given you the common courtesy of saying, Mollie, do you mind if I take the car a couple of blocks up the street to run an errand this morning, you would have said okay?

[Defense Counsel]: Objection to form and foundation. I don't want

you to speculate.

THE WITNESS: Yeah, I was going to say, I can't say to be honest what I would or wouldn't have done as far as allowing her to take it because that had never been an issue with us before.

But I had never, it's not like we had ever discussed it, but I found out at that time she didn't even have a valid driver's license.

So unless I - - if she would have ever asked me that, that might have been something that I would have even questioned do you even have a license or, no, you're not insured. This isn't just my insurance, it's my husband's insurance. I mean, ask my younger son how quick I am to give up the keys to my car, and he'll tell you, I don't do it. And to be honest, I'm a little gun-shy with it.

[Plaintiff's Counsel] Q. You wouldn't let her run up the street for a couple of blocks?

A. I - - like I said, it's speculation at this point because I wasn't put in that position and so I can't say that. Because my son was there, if she really needed to go that bad she should have just asked my son.

Q. Your son was present at the - -

A. Right. * * * He was like in his room * * * playing video games or whatever, he was like I didn't even know she took it, Mom.

* * * I even asked Beth why didn't you just ask Olyn? Why didn't you have Olyn take you? * * *

{¶ 73} Mollie testified that when she left the house for work, she had a car key in

her purse, and the spare key was in her "top dresser in [her] bedroom," where she kept "spare things." Mollie testified:

I've always had a junk drawer in my bedroom in my dresser, yeah. I don't want to call it a junk drawer, but I've always had a drawer where specific things that I would need to get to that I wouldn't use daily but would need to get to quickly or always remember where they're at, that is the same place. * * *

{¶ 74} Mollie testified that she did not feel she needed to "put [her] car keys under lock and key with anyone that walk[ed] into [her] home"; she "felt it was clear that at no time anyone would take my vehicle without specific consent or asking me in the first place * * *."

{¶ 75} The following exchange occurred regarding Mollie's communication with her insurance company, Nationwide, about the accident:

[Plaintiff's Counsel] Q.   And what did they tell you with respect to whether a claim should be submitted or not?

A.   Well, they didn't tell me specifically.   They asked me about the incident, the accident, and what had happened, and I told them.   And I said * * * I don't want to file a claim because this is on this person, it's not on me.   And I don't pay for the insurance, my ex does, and it's under a divorce decree, and I don't want my rates to go up * ** at the long run I felt like I was saving myself money by just repairing the car myself rather than dealing with them * * * hiking up the rates and then my * * * ex-husband calling me and having to go back to court over stuff.

**{¶ 76}**  Mollie testified that the insurance premiums on the policy were paid on a six-month basis from June 16 to December 16.  When asked if she shared with Nationwide that Branham had lived in her home for an extended period of time helping to take care of her kids, Mollie responded that Branham had stayed at her house "on, for several occasions, her or her children, but never in any type of capacity where she had any right to view my home as her home."

**{¶ 77}** Mollie testified as follows regarding entrustment of her vehicle to Branham:

> First of all, verbal consent and understanding, with questions, is always going to be first and foremost for someone else driving another person's vehicle.

> And it has to be agreed upon by both parties and then there has to be a set standard of what the * * * rules or responsibility would be.  And since they were never discussed, this is a dead issue concerning Ms. Branham taking my car.

**{¶ 78}** Mollie testified that she did not generally loan her car out, that Branham had been the last person to drive it other than Mollie, and that prior to that, her son had driven it; her son had his own insurance and would have been covered if he had driven her car. According to Mollie, she would not have entrusted her car to Branham because she knew Branham did not have a car and therefore would have assumed she did not have car insurance; "therefore, she would not be someone I would entrust my vehicle to."

**{¶ 79}**  Construing the evidence most strongly in favor of Cherryhill, we conclude that Mollie did not give express permission to Branham to drive the Honda, and that no genuine issue of material fact remained for trial on the issue of express consent.   Mollie

testified that she did not give Branham permission to take the car and that she only became aware that Branham had driven the vehicle when she learned of the accident.

{¶ 80}  As to implied consent, there was also no genuine issue of material fact for trial. We conclude that the trial court mischaracterized Mollie's testimony when it determined that it was "undisputed" that Branham "was living with [Mollie] and taking care of her children, her's [sic] and Mollie's" and that Branham "had driven the car or other cars owned by [Mollie] before."  Mollie testified that Branham or her children occasionally stayed with her for only a day or two at a time prior to the accident, and that Branham also lived with her mother, who helped care for Branham's children.  Mollie testified that Branham was not in her home "the whole time."  Mollie's youngest son was living with her at the time of the accident and was able to drive his own car, and the record did not support a conclusion that Mollie relied upon Branham to watch her "children."

{¶ 81} Branham watched Mollie's children during the 1998-2001 time period, and Mollie testified that Branham had occasional use of, but limited access to, Mollie's vehicle at that time, but that Branham "was not allowed to just take [her] car at will."  Mollie helped Branham obtain her own vehicle, and their friendship deteriorated in part because Branham stopped making payments as agreed on the vehicle.

{¶ 82}  Mollie did not testify that Branham drove her vehicle after they rekindled their friendship in 2016 other than the day of the accident.   Mollie testified that she herself drove Branham to different places and helped her run errands.  This testimony was consistent with Mollie's testimony that she did not understand why Branham had not just asked her son, who occasionally drove Branham to Mollie's house, to drive her that day.  Mollie testified that she would sometimes allow Branham to remain inside her home in

following morning if she had spent the previous night, or that her son would let Branham in if she were dropped off, but there was no testimony that Branham had a house key or the ability to come and go from Mollie's home as she pleased. Mollie testified that Branham had not lived in Mollie's home "in the last 15 years," but had stayed at her house on occasion, or her children had, "but never in any type of capacity where she had any right to view [Mollie's] home as her home." Mollie's testimony about the nature of her relationship with Branham was unrebutted.

{¶ 83} Mollie did not leave her spare key in a visible location in a manner suggesting that the car was available to Branham. On the day of the accident, Mollie took her regular car key with her, in her purse. She kept the spare key in a designated drawer in a dresser in her bedroom; Mollie testified that the key was "put up" or put away, and that she felt "it was clear that at no time anyone would take my vehicle without specific consent or asking me in the first place." Branham, a guest and not a cohabitant, entered Mollie's bedroom and removed the spare key. In light of all of Mollie's testimony, the fact that Branham knew where the spare key was located based upon Mollie's habit of keeping items there did not create a genuine issue of material fact as to the issue of implied consent.

{¶ 84} Mollie expressed concern about Branham's transient and unstable lifestyle and her demonstrated a lack of responsibility. According to Mollie, she would not have entrusted her car to Branham, knowing that Branham did not have a car and likely did not have car insurance. As noted above, the trial court concluded that Mollie's statement that she did not care where Branham was driving on the date of the accident "could be construed to mean it was not a concern because it was incidental to her care of the

children that such a short drive would be permitted. On the other hand, it could be construed to mean she does not remember because it was not important." We note that the statement could further be construed to mean that Mollie did not care where Branham was going because she did not have Mollie's express or implied consent to go anywhere in Mollie's car.

{¶ 85} Finally, we have reviewed Officer Hamlin's brief deposition, wherein the following exchange occurred:

[Defense Counsel] Q. * * * And so was someone cited for the accident?

* * *

[Officer Hamlin] A. Yes. It's Beth Branham.

* * *

Q. I issued her three citations, license forfeiture suspension, left of center, and a marked lanes of travel violation.

Q. Do you know what happened, ultimately, with those? Whether they were paid or disputed?

A. I checked online and she pled guilty to all three charges.

* * *

Q. * * * One of the major disputes in this lawsuit is the nature of * * * the permission between Ms. Branham, and * * * [Mollie] Kefaya.

* * *

Q. * * * And then was there any indication about whether or not the vehicle was being driven with permission?

A.   At the time I did not think, or I did not believe that [Beth] actually had permission to drive the vehicle.   She had stated to me that she had driven it in the past, but she did not give any specific dates.

And there was, I don't want to say a confrontation but there was some type of disagreement between the two of them and they were talking about it.   I did not overhear it.

At the time I thought that she did not have permission; however, [Mollie] was not going to pursue the matter.

Q. * * * I want to make sure I understand because this makes a difference.   Are you certain that she said she had driven this particular vehicle before or whether or not she had driven a vehicle before?

A.   She had driven a vehicle.   It wasn't specific, no.

Q. * * * And you got the impression from your conversations and the interactions you observed.   Did Ms. Kefaya seem to be surprised or not know that [Branham] was driving the vehicle?

A.   She was agitated.   She was agitated, yes.   And - -

[Plaintiff's Counsel]: Objection.

THE WITNESS:   I don't think she knew she was driving the vehicle, but she wasn't going to pursue the matter with me.

[Defense Counsel]: Q.   And did she give you any indication why that was or just she left you with the impression she didn't want to pursue it?

A.   It was my impression, yes.   No, she didn't.

{¶ 86}  Hearsay "is a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). We need not determine whether or not Hamlin's deposition contained hearsay from Branham; there was no express admission by Branham that she had Mollie's permission to drive the vehicle that day, nor was there any statement by Branham that Mollie denied her permission to drive the vehicle that day, contrary to the parties' representations. In other words, Branham's statement to Officer Hamlin that she had driven an unspecified vehicle belonging to Mollie at an unspecified time was neither exculpatory nor inculpatory.

{¶ 87} Based on the evidence in the record, we conclude that no genuine issue of material fact existed, and Branham did not have Mollie's permission to drive the 2012 Honda on the date of the accident. In other words, we cannot conclude as a matter of law that there was a genuine issue of material fact as to both Branham's negligent driving *and* Mollie's negligence in entrusting a vehicle to Branham. Having concluded that there was no genuine issue of material fact that Branham drove Mollie's vehicle without her permission, we further conclude that the trial court properly granted summary judgment in Mollie's favor. Cherryhill's third assignment of error is overruled.

{¶ 88} All assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J., concurs:

{¶ 89} I concur in the majority opinion. I write separately to note I also agree with

the trial court's conclusion that, on this record, there is no genuine factual issue that Mollie knew or should have known Branham was an incompetent driver. Contrary to Cherryhill's argument, Branham's financial status, without more, did not support the inference that Mollie should have known Branham did not have a license or was otherwise an incompetent driver.

FROELICH, J., concurs:

{¶ 90} The Civil Rules and case law shield only trial preparation materials and other materials created for the primary purpose of being transmitted to an attorney retained to defend the insured. Not everything an adjuster does or the statements of everyone he or she speaks with is protected by the work product privilege. However, given the unique facts of this case, I concur in both the majority and concurring opinions.

Copies sent to:

Scott R. Thomas
Beth Anne Branham
David C. Ahlstrom
William H. Falin
Hon. Barbara P. Gorman